UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BAILEY REED, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:18-CV-1968-GCS |
| | ) |
| SOUTHERN ILLINOIS UNIVERSITY d/b/a SOUTHERN ILLINOIS UNIVERSITY AT EDWARDSVILLE, RANDALL PEMBROOK, ASHLEY COX, KARA SHUSTRIN, and CHAD MARTINEZ, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Bailey Reed alleges that she was sexually assaulted by another student when she was enrolled as a student at Southern Illinois University at Edwardsville in October 2017. She reported the assault to the university's Title IX office, and she brings suit claiming that Defendants Southern Illinois University, Randall Pembrook, Ashley Cox, Kara Shustrin, and Chad Martinez mishandled the Title IX investigation into her assault, violating her statutory and constitutional rights in the process. Reed filed an amended complaint, as directed by the Court, on October 22, 2019. Defendants now move to dismiss Count IV of the amended complaint. (Doc. 62, 67). For the reasons delineated below, the Court denies Defendants' motions to dismiss Count IV.

### FACTUAL ALLEGATIONS

In her amended complaint, Reed alleges that she was a student at Southern Illinois

University at Edwardsville in October 2017, living in campus housing. Throughout the month of October, she and another SIUE student exchanged friendly and "flirty" messages. She liked the other student. At one point, the other student sent Reed a text and asked, "Do you find me trustworthy?" She replied, "From what I know, Absolutely." He then asked, "Do you think I'm respectful?" Reed replied, "From what I know, I think you're a great guy."

About a day or so after the exchange, the student asked Reed via online communication what she was doing, and she replied that she was getting ready to meet a friend. The student responded that he was coming over to her on-campus apartment. Reed alleges that she did not invite him over, but she did not protest because she liked him.

Reed signed the student into her building, allowing him to come to her apartment. Once there, he grabbed her by the hand and pulled her onto his lap. Reed was uncomfortable and tried to pull herself away. The student began kissing her, and she kissed him back. She quickly told him, however, that she did not want to have sex. He ignored her and picked her up and threw her onto the bed. According to the amended complaint, the student pulled Reed's head toward his genitals to force her to perform oral sex through his clothing, but she told him, "NO," and that she was "not into that sort of thing." She also told him she wanted to get to know him better before doing "anything." He proceeded to sexually assault her despite Reed repeatedly telling him "no" and crying. The student repeatedly told her, "It's fine." Later that night, after discussing it with a friend and with her mother, Reed went to Anderson Hospital to report that she

had been raped.

At the hospital, a woman entered Reed's room and told her that she worked for a non-profit rape crisis center named Call for Help and that another Call for Help employee, Defendant Ashley Cox, who worked with all SIUE students who were sexually assaulted, would be in touch. Reed was scared, traumatized, and recovering from the rape and rape-kit procedure when she received the call from Cox. Cox allegedly told Reed that she worked for Call for Help and that their conversations were confidential. Cox told Reed that she did not have to report the rape, but Reed decided she wanted to and went to the SIUE police department. Cox met her there.

In statements to the police, Reed and her attacker agreed that she said she did not want to have sex with him. Reed indicated that the encounter became forceful after she said no, and the amended complaint alleges that the attacker admits that, after Reed said no, he pulled her pants down without her consent in violation of SIUE's consent policy.

At the police department, Cox and Reed spoke privately, and Cox asked Reed how she wanted to proceed. Reed said that she wanted to report the rape and that she wanted to move from her on-campus apartment. Cox then briefly described the Title IX process, allegedly emphasizing how difficult it, and the criminal process, would be. She asked if Reed was sure she wanted to report the assault, and Reed confirmed that she wanted to report it to both the Title IX Office and to the police.

After the conversation, Reed's mother, in front of Reed, told Cox that she was concerned about Reed remaining in the apartment where she had been assaulted, and Cox replied sternly that there was nothing that could be done. Cox then told Reed that

she would inform SIUE's Title IX office that Reed wanted to report a sexual assault and that someone from the office would contact her within a few days. When no one from the office called, Reed's mother tried to reach out to Cox, but Cox did not return her calls.

Cox allegedly failed to reveal that she had become an employee of SIUE approximately four months earlier. The amended complaint alleges that SIUE used Cox for a state-mandated confidential advisor role. Cox allegedly has no training or experience with Title IX investigations, and Reed claims that SIUE failed to provide training, despite using Cox as a confidential advisor.

When Cox did not return Reed's calls, Reed's mother reached out to the Title IX office directly, but she did not receive a response until she left a message threatening to contact a Dean. At that point, she was told that the entire office was out and that it would be a week or more before someone was available to meet with the family. Reed's mother demanded quicker action, and a meeting eventually was scheduled.

Reed and her family first met with Defendant Kara Shustrin, an Associate Dean, who said that the Title IX office was aware of the assault but that Cox told them that Reed did not want to make a report. Reed told her that she did want to make a report, and Shustrin and Defendant Chad Martinez, the Title IX Coordinator, offered Cox as a support contact and liaison for the Title IX process. Reed declined the offer of Cox's assistance. Reed alleges that she and her counsel did not learn of Cox's status as an SIUE employee until September 2018 through online research, and she alleges that Cox discouraged her from reporting her sexual assault and failed to start the Title IX process, despite Reed's desire to proceed.

Reed received an emergency *ex parte* no-contact order from the Madison County Circuit Court. The order directed that Reed's attacker was not permitted to be on the SIUE campus. Reed sought assistance from Shustrin and Martinez in enforcing the order, and she requested safety accommodations from the Title IX Office so that she could attend school without issue. Shustrin and Martinez, however, allegedly allowed Reed's attacker to remain on campus and to attend classes, including a class in which both he and Reed were enrolled. Reed alleges that Defendants usurped her right to walk the campus and access her education free from fear. Shustrin and Martinez told Reed that she could attend by Skype as long as she could find a friend to set up the Skype in the classroom for her. They offered no assistance with the technology and offered no alternative should the friend not attend class. Reed and her family protested this exclusion from direct access to her education. Reed sent emails about feeling unsafe on campus, and Shustrin's repeated response was an internal mocking email to Martinez saying, "sigh."

The protective order was modified on November 16, 2017, to allow Reed's attacker to visit his campus apartment and to attend two specific meetings with a professor provided that he communicated through his attorney the dates and times so that Reed could avoid campus. He also was permitted to attend classes that Reed was not enrolled in, "provided that he d[id] not initiate contact with or harass or intimidate [Reed] and ma[de] efforts to stay away from her if he encounter[ed] her." He was not allowed to attend any class in which Reed was enrolled.

Reed's friends began reporting that her attacker was violating the order by visiting campus during times he did not have class and by going to the school cafeteria and to the

Student Disabilities Services Department where Reed received services. Reed reported this information to Shustrin and Martinez, but they failed to act. Reed alleges that, emboldened by the lack of enforcement, her attacker violated the order of protection in December 2017. Her attacker went to the class the two shared, sat in Reed's seat, and waited for her to arrive. One of Reed's friends alerted her before she arrived, and Reed called the police. The student was arrested, but SIUE did not punish him for his actions and did not offer any safety-related accommodations to Reed after the violation of the protective order. Defendants instead excused his behavior and told Reed that a professor "invited" her attacker to the classroom.

The professor was aware of the no-contact order, as Reed's attacker had asked her to testify on his behalf. The professor sought advice from Shustrin, and, according to the amended complaint, the professor revealed her bias against Reed by stating that the attacker would never get a fair opportunity in a hearing on the no-contact order because the attacker is black and Reed is white. Shustrin did not challenge the professor's statement. She forwarded the email to Martinez. At the hearing on the no-contact order in January 2017, the professor testified in defense of Reed's attacker and also assisted in his defense in a misdemeanor charge for violating the order of protection by attending the class and sitting in Reed's seat.

Defendants Shustrin and Martinez were responsible for investigating the sexual assault, and the investigation began in mid-October and continued through late February 2018, lasting nearly 100 days. SIUE maintains a written and published Title IX investigation policy, which instructs that a "Title IX Investigation should be completed

within thirty (30) working days of receipt of a complaint. The Title IX Coordinator may extend the timeframe for good cause, including University breaks." When Reed inquired as to the status of the investigation, Shustrin and Martinez told her that the other student requested extensions. Reed alleges this does not constitute good cause and that Defendants admitted they gave him too much time.

According to the amended complaint, Martinez received negative performance reviews for failing to conduct timely investigations. SIUE noted that his tendency not to be prompt potentially exposed the school to liability. Martinez lacked training on how to conduct prompt investigations. Investigations that take too long can lead to a hostile environment, and Reed alleges that the investigation in this case was more than 40 days late.

Reed also alleges that the investigation was heavily gender-biased and that the investigator's questions were so sexually-charged and discriminatory that one witness reported that she cried during her interview and found the interview biased. Reed also takes issue with the investigation, as counsel for her attacker requested and received security footage from her dormitory on the night of the assault, but her counsel's request for the same footage was denied. Reed also points out that she interviewed repeatedly, despite having been interviewed on videotape by the police.

Martinez requested a follow-up interview with Reed in January 2018. He allegedly asked Reed to describe in detail the sexual positions of her rape, and, when Reed was confused as to the order of some text messages that she sent after the assault, he said, "Gotcha." Reed claims that moments later he explained to her how to appeal the decision

of the Title IX Office, almost a month before a decision was issued.

Two days after the interview, a hearing on Reed's order of protection was held in Madison County. She testified and was cross-examined by her attacker's attorney. The attacker also testified and was cross-examined by Reed's attorney. The judge found that Reed was "a victim of non-consensual sexual penetration" and that she was entitled to a full, permanent no-contact order. She alleges that Defendants were not present for the hearing and did not review a transcript before reaching a decision in their investigation.

On February 9, 2018, the Title IX Office issued a decision concluding that Reed's attacker did not violate any SIUE sexual assault or harassment policies. The decision offered five findings in support: (1) Reed liked and wanted to spend time with her attacker before the assault; (2) Reed enjoyed attention from him and had been "flirty" before the assault; (3) Reed didn't act the way Martinez believed a rape victim should act immediately following the rape; (4) Reed had her timeline of sexual acts and communications confused, undermining her credibility; and (5) Martinez found the sexual positions of the assault as described by Reed difficult to "envision."

The amended complaint alleges that Martinez's findings focus on what happened before the sexual encounter and what happened after, but the findings ignore what happened during, even though the issue at the crux of the investigation was whether Reed consented. Martinez made no finding as to whether Reed consented, when or how she consented, or whether she consented to some acts but not to others. The report uses the word consent ten times, but seven of those occurrences were in relation to explaining the consent policy. Reed alleges that Martinez's findings were erroneous and showed

gender bias because he found both Reed and her attacker to be credible. For example, taken at face value, it appears that Martinez believed Reed when she said she did not consent to the sexual activity. However, it also appeared that Martinez believed the attacker when he said that Reed told him she did not want to have sex with him and then he immediately pulled her pants down.

Reed appealed the decision, and the Sexual Harassment Panel held a hearing. The panel questioned Reed and her attacker. When asked if she had any new evidence, Reed presented evidence that another victim had come forward to report an attempted sexual assault by Reed's attacker. The panel overruled the findings of the Title IX Office and found for Reed.

A few weeks after the ruling, Defendant Randall Pembrook, the Chancellor, emailed Reed's counsel explaining that his determination would be late. Neither Reed nor her counsel had been made aware of any determination pending before Pembrook. Counsel eventually uncovered that Pembrook was reviewing the decision of the Sexual Harassment Panel. Pembrook reversed the Sexual Harassment Panel on April 19, 2018. Pembrook did not inform Reed directly of his decision, instead sending a letter addressed to the other student to that student's attorney via email and cc'ing Reed's counsel. Pembrook did not offer an explanation for his decision, but he did express that Reed's attacker received all his due process rights. Pembrook's decision did not address any impact on Reed's rights.

Reed appealed to the Board of Trustees, but the Board refused to hear the matter on procedural grounds in September 2018. During the pendency of Reed's appeal, the

SIUE President filed a brief in support of Reed's attacker and of Defendants' investigation and findings.

Before Reed filed her lawsuit, Defendant Pembrook issued a campus-wide email, which Plaintiff alleges contained false information and was issued to undermine her credibility. Pembrook told everyone on campus that no criminal charges had been filed, though criminal charges for sexual assault were under advisement with the Madison County State's Attorney and criminal charges were pending for the alleged violation of the protective order. The email named Reed personally. Pembrook allegedly admitted that the email was written by SIUE's marketing department and that he did not check the statement for accuracy.

Reed also points out that in August 2017 the Department of Education found that SIUE had a pattern of failing to fully investigate sexual assault claims and that Defendants' investigations were known to exclude relevant evidence and to miss timely deadlines. The Department of Education also found that Defendant Martinez and the appeal panel at SIUE were not adequately trained on what relevant evidence should be considered. SIUE was ordered to provide training to its Title IX employees.

Pembrook also has allegedly admitted to not knowing how Title IX applies to sexual assault and to not understanding the Title IX process. He stated that the perpetrator gets the presumption of innocence and that a complainant should not get safety accommodations unless and until an investigation is complete and a perpetrator has been found guilty. He also allegedly demonstrated a lack of familiarity with the work done during a Title IX investigation and with the definition of a hostile environment as it

relates to student harassment.

In Count IV of her amended complaint, Reed alleges that Defendants Martinez, Pembrook, Cox, and Shustrin violated her Equal Protection rights. She claims that she had the right to personal security and bodily integrity and that Defendants violated her rights by failing to investigate her attacker's misconduct, failing to appropriately discipline her attacker, failing to adequately train and supervise Cox, Shustrin and Martinez, and by manifesting deliberate indifference to her sexual assault and ongoing harassment.

## LEGAL STANDARDS

A complaint must include enough factual content to give the opposing party notice of what the claim is and the grounds upon which it rests. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 698 (2009). To satisfy the notice-pleading standard of Rule 8, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief" in a manner that provides the defendant with "fair notice" of the claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)(citing *Twombly*, 550 U.S. at 555 and quoting Fed. R. Civ. P. 8(a)(2)). In ruling on a motion to dismiss for failure to state a claim, a court must "examine whether the allegations in the complaint state a 'plausible' claim for relief." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)(citing *Iqbal*, 556 U.S. at 677-678). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," rather than providing allegations that do not rise above the speculative level. *Id.*

ANALYSIS

Defendants argue that Count IV of the amended complaint must be dismissed because Reed fails to identify a violation of her equal protection rights in that she fails to allege that she was treated differently from similarly-situated individuals and that she fails to allege that Defendants intentionally treated her differently because of her gender. They also argue that Reed fails to identify a violation of her right to personal security and bodily integrity, and they ask the Court to find that they are entitled to qualified immunity because Reed fails to plead facts establishing that a constitutional violation occurred.

**A.   Equal Protection Claim: Treatment of Similarly-Situated Individuals**

The Equal Protection Clause of the Fourteenth Amendment demands that no state "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Plaintiff suggests that to succeed on an equal protection claim, she must establish that "(1) the state actor intentionally treated plaintiff[] differently from others similarly situated; (2) the difference in treatment was caused by the plaintiff['s] membership in the class to which they belong; and (3) this different treatment was not rationally related to a legitimate state interest." *See Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009)(citing *Smith v. City of Chicago*, 457 F.3d 643, 650-651 (7th Cir. 2006)). Defendants argue instead that Reed must establish that there was not an exceedingly persuasive justification for the intentional discrimination. *See, e.g.*, *Hayden ex rel. A.H. v. Greensburg Community School Corp.*, 743 F.3d 569, 577 (stating that "[g]ender is a quasi-suspect class that triggers intermediate scrutiny in the equal protection context; the

justification for a gender-based classification thus must be exceedingly persuasive.")(citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

Typically, gender-based claims receive heightened scrutiny, and Reed describes her classification as a class of females at SIUE who have suffered gender violence. She asks the Court to compare that class to the class of males who are alleged to have perpetrated gender violence on the SIUE campus. As Defendants put forth that intermediate scrutiny is appropriate for Reed's claim in Count IV and that burden is more difficult for them and easier for Reed to establish, the Court is inclined to agree that intermediate scrutiny applies to Reed's claim. Reed, however, made a point of stating that she disagreed with the standard suggested by Defendants and that only a rational basis for their alleged behavior must exist, which makes her burden more difficult to establish. The Court declines to resolve this conflict at this time, however, as even under a rational-basis standard, Reed has sufficiently stated a claim for relief.

In terms of considering which group of students should be considered similarly-situated to Reed for purposes of a gender-discrimination claim, the Court disagrees with Defendants' suggestion that it may only consider the treatment of Reed, a female Title IX sexual assault complainant, versus the treatment of a male Title IX sexual assault complainant. Reed's complaint is pleaded in a different manner. Reed alleges that she was treated differently during the Title IX sexual assault investigation because of her gender, and so it strikes the undersigned that her treatment should be evaluated alongside the treatment of non-female students involved in a Title IX sexual assault investigation, a group to which her alleged attacker belongs, regardless of which student

is the complainant and which is the alleged attacker. If non-female students are treated differently from female students during the investigation process, then that could demonstrate that female students, a class to which Reed belongs, are treated differently due to their classification.

Here, there are many allegations that Reed was treated differently from her alleged attacker, a non-female student who was a party to a Title IX investigation. She was interviewed more times during the investigation than he was. Her allegations about the report issued at the end of the investigation suggest that Defendants treated her with more skepticism, finding that she liked her attacker and enjoyed his attention before the alleged assault and that she didn't act how a rape victim should act. They offered her attacker continuances and access to video footage that she did not receive. The attacker was also made privy to the review of the investigation by Pembrook, but Reed and her counsel were not. Reed was further named in a campus-wide email, which she alleges contained false information about her.

Reed's allegations also suffice to state a claim that she was so treated because of her gender, as a clearly-pleaded basis of her claim is that the investigation of her allegation of gender violence was mishandled in part because of biases toward her as a woman. The Title IX coordinator found her "flirty" ahead of the alleged assault and found that she didn't act as a rape victim should. He wrote that the sexual positions she described were difficult to envision. These allegations, coupled with all of the other allegations in Reed's detailed complaint, make it clear that she is claiming her status as a woman, not solely as a female complainant, contributed to her disparate treatment by

Defendants. In short, Reed alleges many ways in which her treatment throughout the Title IX investigation could be viewed as less generous than the treatment afforded to her alleged attacker, and that is sufficient, at this stage, to establish that Reed was treated differently from similarly-situated students.

### B. Due Process Claim: Violation of Bodily Integrity

A plaintiff can bring a claim under § 1983 alleging that her bodily integrity was violated by a state actor under the substantive component of the Due Process Clause. *See Wilson v. Cook County*, 742 F.3d 775, 780-781 (7th Cir. 2014)(citing *Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997)). Generally speaking, the state does not have a duty to protect individuals from harm by private actors. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989). Under the state-created danger doctrine, however, the substantive component of the Due Process Clause "imposes upon the state a duty to protect individuals against dangers the state itself creates." *King ex rel. King v. East St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007)(citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)). To establish a claim related to a state-created danger, the "state, by its affirmative acts, must create or increase a danger faced by an individual." *Id.* at 818 (citations omitted). The state's failure to protect "an individual from such a danger must be the proximate cause of the injury to the individual," and the "state's failure to protect the individual must shock the conscience." *Id.* (citing references omitted). An official's conduct shocks the conscious when it "may be deemed 'arbitrary in the constitutional sense.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Conduct must rise to a level beyond mere negligence, demonstrating deliberate indifference to an

individual's rights in order for an official's conduct to be conscience-shocking. *Id.* at 818-819.

Here, Reed's personal security and bodily integrity claim center on the allegations related to Defendants' perceived indifference to her safety after she secured an order of protection against her attacker. Reed alleges that her attacker violated the order of protection against him because he was emboldened by the lack of enforcement or care given to it by Defendants. While it is a close call, Reed pleads sufficient facts to state a claim under the state-created danger doctrine. She alleges specific acts by Defendants that created or increased a danger she faced, particularly the risk of being in the same place with an individual against whom she had an order of protection. As a result of this indifference, according to Reed, the individual violated the order of protection.

This is not the end of the inquiry, however, because Reed was not injured physically by her attacker's violation of the order of protection. It is not clear, however, that the injury alleged by a plaintiff must be a physical injury, as the Seventh Circuit took no position on the inapplicability of the state-created danger doctrine to a situation where school officials were alleged to have created a dangerous environment by failing to prevent bullying of a child at school. *See, e.g., D.S. v. East Porter County School Corporation*, 799 F.3d 793 (7th Cir. 2015)(upholding grant of summary judgment on state-created danger claim due to lack of evidence of affirmative acts and conscience-shocking behavior but not addressing lack of physical injury). As such, the Court finds that the allegations made by Reed are sufficient to state a claim, and her claim of a violation of bodily integrity may proceed at this time.

### C. Qualified Immunity

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Here, the Court cannot say, taking the facts in the light most favorable to Reed, that Defendants' conduct did not violate Reed's constitutional rights, and, as such, the Court will not grant Defendants qualified immunity at this time.

### Conclusion

For the above-stated reasons, Defendants' motions to dismiss (Doc. 62, 67) are **DENIED**. All claims in all counts remain pending.

**IT IS SO ORDERED.**

Dated:  January 31, 2020.

                                                                                                                            _____
                                                                                                                            GILBERT C. SISON
                                                                                                                             United States Magistrate Judge

*Digitally signed by Magistrate Judge Gilbert C. Sison*
*Date: 2020.01.31 15:55:34 -06'00'*